

Entered on Docket
October 14, 2008

_____
**Hon. Bruce A. Markell
United States Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEVADA

\* \* \* \* \* \*

| | |
|---|---|
| In re: | Case No.: BK-S-07-16504-BAM |
| JOHN L. SMITH, | Chapter 7 |
| Debtor. | |
| | Adversary No. 08-01012-BAM |
| SHELDON G. ADELSON, | |
| Plaintiff, | |
| | Date:  September 30 & October 10, 2008 |
| v. | Time:  9:30 a.m. |
| JOHN L. SMITH, | |
| Defendant. | |

**OPINION REQUIRING THE NEVADA GAMING CONTROL BOARD TO COMPLY PARTIALLY WITH JOHN L. SMITH'S SUBPOENA DUCES TECUM RE: DEPOSITION**

This proceeding raises the issue of whether this court may require the Nevada State Gaming Control Board to respond to a federal subpoena regarding one of its licensees. Normally, such information is privileged against disclosure, but this case is anything but normal. It is a nondischargeability proceeding in which plaintiff Sheldon Adelson asserts that the debtor, John L.

1

Smith, defamed Mr. Adelson in a book.[1]

The court recognizes that Nevada has a strong interest in conducting confidential investigations of applicants for gaming licenses. Nonetheless, the court finds that in certain limited circumstances, such as those present here, a defendant in a libel case may require the Board to produce its files so that the defendant may fairly defend against a licensee's libel claims. Contrary to normal discovery practice, however, this disclosure must be regulated and reviewed so that Board documents are produced only to the extent that Mr. Smith's interest in obtaining those documents outweighs the state's interest in maintaining the documents' confidentiality.

**Background**

In particular, the dispute centers on two pages of Mr. Smith's book, *Sharks in the Desert*. Mr. Adelson contends that various statements on these pages libel him because they allegedly link Mr. Adelson to unsavory characters, and to unsavory activities. The two-page passage also mentions that Mr. Adelson "sailed through" Gaming Control Board review in 1989, albeit after answering some "sticky questions." Mr. Smith defends the libel charges vigorously, although he acknowledges some error; later editions of the book contain a one-page errata confessing error on many, but not all, of the statements complained of by Mr. Adelson.

The nondischargeability action, in which the libel action is embedded (since there has to be a debt before that debt can be declared nondischargeable), is set for trial this December.[2] It has thus far been a hard-fought case – suffice it to say that the parties intensely dispute every point that can be disputed, and then some. Mr. Smith has indicated that his defense will seek to establish at

---

[1]Mr. Adelson and Mr. Smith are not strangers to publicity. Mr. Adelson is a billionaire casino executive and philanthropist; Mr. Smith is a newspaper columnist for the largest paper in Las Vegas who, among other things, writes about the casino industry.

[2]This proceeding has its roots in a prior California state court libel action, stayed by Mr. Smith's commencement of his bankruptcy. That fact, and the remainder of the procedural background of this case – including why it remains in bankruptcy court – are set forth in this court's prior opinion in *Adelson v. Smith* (In re *Smith*), 389 B.R. 902 (Bankr. D. Nev. 2008).

least two propositions. First, even if Mr. Smith's statements were written without care or other justification, some were nonetheless true. *See Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516-17 (1991) ("As in other jurisdictions, California law permits the defense of substantial truth and would absolve a defendant even if she cannot 'justify every word of the alleged defamatory matter; it is sufficient if the substance of the charge be proved true, irrespective of slight inaccuracy in the details.'"); *Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 764-65 (Cal. Ct. App., 3d Dist., 2007) ("In all cases of alleged defamation, ... the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose."). Second, to the extent that Mr. Adelson's damage claims involve compensation for injury to or diminution of his character, Mr. Adelson's character was not, or could not be, injured or diminished by the alleged libelous statements. *See Melaleuca, Inc. v. Clark*, 78 Cal. Rptr. 2d 627, 636 (Cal. Ct. App., 4th Dist. 1998); 2 RODNEY A. SMOLLA, LAW OF DEFAMATION § 9:59 (2d ed., 1999 & Supp 2008) ("a prior bad reputation is an appropriate ground for reducing damages").

These defenses necessitated taking Mr. Adelson's deposition.[3] After extended procedural wrangling, this court entered an order requiring Mr. Adelson to submit to a deposition. At the deposition, when questioned about various matters related to the 1989 licensure proceeding, Mr. Adelson understandably could not recall some of the events, and stated that he had not kept any relevant records.

Mr. Smith's attorneys then subpoenaed the records of the Nevada Gaming Control Board related to the 1989 licensing proceeding. This broad request drew opposition from both Mr. Adelson and the Gaming Control Board.[4] Based upon the authorities and the analysis contained in

---

[3] For reasons that have not been fully explained, Mr. Adelson's deposition had not been taken in the prior California action.

[4] The Board did produce the transcript of the hearing, which was public, and the first page of Mr. Adelson's application.

3

1  the next section, the court ordered an in camera inspection[5] of the documents still possessed by the
2  Board, and ordered that several pages of the Board's file be produced to Mr. Smith's lawyer.
3  The court's analysis and the process used is examined next.

**Analysis**

Both the Board and Mr. Adelson contend that documents submitted to the Board as part of a licensing proceeding are confidential and privileged, and should not be produced. If Nevada state law supports the claims that such privileges exist, and if no exception or waiver applies, then FED. R. CIV. P. 45(c)(3)(iii)[6] provides that the court must quash or modify the subpoena.[7]

Nevada has several statutes regarding the confidentiality of documents submitted to and generated by the Board. Section 463.120.4 of the Nevada Revised Statutes states:

> Except as otherwise provided in this subsection and subsection 5, all information and data:
> (a) Required by the Board or Commission to be furnished to it under this chapter or which may be otherwise obtained relative to the finances, earnings or revenue of any applicant or licensee;
> (b) Pertaining to an applicant's criminal record, antecedents and background which have been furnished to or obtained by the Board or Commission from any source;
> (c) Provided to the members, agents or employees of the Board or Commission by a governmental agency or an informer or on the assurance that the information will be held in confidence and treated as confidential;
> (d) Obtained by the Board from a manufacturer, distributor or operator, or from an operator of an inter-casino linked system, relating to the manufacturing of gaming devices or the operation of an inter-casino linked system; or

---

[5] "In camera" is a legalese term for taking official action in a judge's private chambers or in a courtroom with all spectators excluded. BLACK'S LAW DICTIONARY 775 (Bryan A. Garner, ed., 8th ed. 2004). An in camera inspection is a "trial judge's private consideration of evidence." *Id.* According to BLACK'S, although the term is Latin, it is not italicized. *Id.*

[6] Rule 45 of the Federal Rules of Civil Procedure is applicable to this proceeding under Rule 9016 of the Federal Rules of Bankruptcy Procedure.

[7] As recognized in *Laxalt v. McClatchy*, 109 F.R.D. 632, 635 (D. Nev. 1986), the inquiry is necessarily a federal one regarding compliance with Rule 45, with the relative interests of the State of Nevada and the parties being balanced according to the procedures set forth in that rule. *See id.* ("Literal compliance [with NEV. REV. STAT. § 463.341] is not required because the Federal Rules of Civil Procedure cover the situation.").

4

> (e) Prepared or obtained by an agent or employee of the Board or Commission relating to an application for a license, a finding of suitability or any approval that is required pursuant to the provisions of this chapter,
>
> *are confidential* and may be revealed in whole or in part only in the course of the necessary administration of this chapter or upon the lawful order of a court of competent jurisdiction.

NEV. REV. STAT. § 463.120.4 (emphasis supplied). In addition, Section 463.144 further provides: "The Commission and the Board may refuse to reveal, in any court or administrative proceeding except a proceeding brought by the State of Nevada, the identity of an informant, or the information obtained from the informant, or both the identity and the information." NEV. REV. STAT. § 463.144.[8]

Both the Board and Mr. Adelson contend that the Board's documents should not be disclosed. The Board initially contends that the documents are absolutely privileged, and that this court has no power to require the turn over of any documents. Mr. Adelson presents a more nuanced argument, contending that the detriments to Mr. Adelson and to the State of Nevada of disclosure far outweigh any benefits to Mr. Smith's defense.

*Absolute Privilege*

The Board, although not Mr. Adelson,[9] raises the applicability of NEV. REV. STAT. § 463.3407.1 That section states:

---

[8] Although not applicable here, since the subpoena at issue is a federal subpoena, Nevada state courts are required to follow a strict procedure regarding any release of confidential information. Section 463.341 of Nevada's Revised Statutes states:

> An application to a court for an order requiring the Board or the Commission to release any information declared by law to be confidential shall be made only upon motion in writing on 10 days' written notice to the Board or Commission, the Attorney General and all persons who may be affected by the entry of such order. Copies of the motion and all papers filed in support of it shall be served with the notice by delivering a copy in person or by certified mail to the last known address of the person to be served.

[9] When specifically asked at the September 30 hearing whether Mr. Adelson was invoking the protection of NEV. REV. STAT. § 463.3407, his counsel stated that he was not.

5

> Any communication or document of an applicant or licensee, or an affiliate of either, which is made or transmitted to the Board or Commission or any of their agents or employees to:
> (a) Comply with any law or the regulations of the Board or Commission;
> (b) Comply with a subpoena issued by the Board or Commission; or
> (c) Assist the Board or Commission in the performance of their respective duties,
> is *absolutely privileged* and does not impose liability for defamation or constitute a ground for recovery in any civil action.

NEV. REV. STAT. § 463.3407 (emphasis supplied). The Board follows this citation with the statement that "[i]ndividuals, such as Mr. Adelson, who subject themselves to Nevada's strict regulation of gaming, do so under the statutory guarantee that any and all information they provide to or is obtained by the BOARD will maintain the confidentiality and privileged status which was intended by the Nevada Legislature." Board Opposition, p. 8. Based upon this, the Board made an absolute claim that it did not have to produce any documents.

The court rejected this claim. Although it is beyond dispute here that Nevada's interests are real and substantial, the Board makes too much of the "absolute" privilege. When read as the Board suggests, it would protect perjurers who submit knowingly false documents to the Board, and then are sued over the effect of those statements. A better and more contextual reading is that NEV. REV. STAT. § 463.3407 refers to the law of defamation – as indicated by the last clause of the statute. Under Nevada's law of defamation, one element requires that there be "an unprivileged publication to a third person." *Pope v. Motel 6*, 121 Nev. 307, 315, 114 P.3d 277, 282 (2005).

Here, given the reference to the law of defamation, it is probable that the Nevada legislature intended to make a policy statement that communications to the Board, given as part of its investigative process, are immune from later defamation suits by ensuring that they would be deemed to be privileged communications. To assume otherwise would be to assume that the Nevada's legislature intended that the interest in confidentiality in licensure proceedings to preempt perjury as well as the ability to impeach a person for telling the Board one thing and telling another in litigation. As a result, the court denied the Board's claim of absolute privilege, if it even had standing to raise it in light of Mr. Adelson's refusal to invoke it .

*Qualified Privilege*

When, as here, there is a claim of privilege asserted to bar the production of relevant evidence, Rule 501 of the Federal Rules of Evidence[10] "provides that where state law provides the rule of decision, state privilege law will govern." *Laxalt v. McClatchy*, 109 F.R.D. 632, 635 (D. Nev. 1986) (*Laxalt I*). Here, NEV. REV. STAT. § 463.120.4 provides that confidential information such as that sought by Mr. Smith's subpoena "may be revealed in whole or in part only in the course of the necessary administration of this chapter *or upon the lawful order of a court of competent jurisdiction*."[11] (emphasis supplied). In *Laxalt I*, the district court indicated:

> Where a court of competent jurisdiction is authorized to order discovery of confidential records, the court must balance the public interest in avoiding harm from disclosure against the benefits of providing relevant evidence in civil litigation. . . . In a libel action, where the records may well go to the heart of material factual issues, the benefits usually outweigh the confidentiality interests.

*Laxalt I*, 109 F.R.D. at 635.

*Laxalt I* is significant. It also involved defamation litigation that involved the issue of whether the Board would have to disclose its confidential records. After deciding in *Laxalt I* to employ federal law to decide the privilege issue, a later decision in the same case set forth the proper test to decide what could and should be disclosed. In this regard, the court stated that because "all of these privileges are essentially governmental privileges, case law from the federal system is persuasive, in that the system of governmental privileges has been more fully developed there." *Laxalt v. McClatchy*, 116 F.R.D. 455, 459 (D. Nev. 1986) (*Laxalt II*). In making this

---

[10]The Federal Rules of Evidence are applicable to this proceeding under Rule 9017 of the Federal Rules of Bankruptcy Procedure.

[11]In *Laxalt I*, the district court found that it was a court of competent jurisdiction as anticipated in the Nevada statute. *Laxalt I*, 109 F.R.D. at 635. The fact that this court is an Article I federal bankruptcy court, instead of an Article III district court, should not make any difference. Under federal law, a bankruptcy court is a "unit of the district court to be known as the bankruptcy court for that district." 28 U.S.C. § 151. Moreover, this court has previously held that it may hear and determine all matters in this litigation, which would perforce include all discovery disputes between the parties, and the order implementing that determination is final and has not been appealed. *In re Smith*, 389 B.R. at 916, 924.

7

inquiry, the district court particularly relied upon *Federal Trade Commission v. Warner Communications, Inc.*, 742 F.2d 1156 (9th Cir. 1984). Using that case, the court set forth the following standard for reviewing the presumptively confidential records held by the Board:

> In applying this weighing process, the court found a four part test helpful. Initially, the relevance of the evidence must be taken into account. Further, the availability of other evidence and the government's role in the litigation must be considered. Finally, the court noted that the extent to which disclosure would hinder frank and independent discussion regarding the agencies contemplated decisions and policies would factor into the court's decision.

*Laxalt II*, 116 F.R.D. at 459 (citing *Warner Communications, Inc.*, 742 F.2d at 1161).

Other courts have adopted a process similar to that followed in the *Laxalt* cases. In *Berst v. Chipman*, 232 Kan. 180, 653 P.2d 107 (1982), an Alabama high school principal had sued a local newspaper for libel over reports of improper recruiting practices at the high school. To defend itself, the paper sought the investigative file of the National Collegiate Athletic Association (NCAA), which was in Kansas. The NCAA sought to bar the production of the file, asserting a deliberative privilege not unlike the privilege relevant here. The trial court had ordered the file produced without intermediate safeguards, and the NCAA sought mandamus from the Kansas Supreme Court. In partially reversing the trial court, the Kansas Supreme Court held that it was error to order production of the file without first conducting an in camera inspection to winnow out parts of the file that were not relevant to the libel action. As is the case here, the file contained statements regarding individuals other than the plaintiff in the libel action, which were not relevant to the lawsuit.

In concluding its discussion, the court stated: "We believe when a claim of privilege, confidentiality or irrelevance is raised the court has a duty to conduct an *in camera* inspection to separate and permit discovery of only the relevant documents, thereby protecting against unnecessary and damaging disclosure of irrelevant confidential material." *Berst*, 232 Kan. at 187, 653 P.2d at 113.

Another libel lawsuit raised a similar issue in *Arce v. Cotton Club of Greenville, Inc.*, No.

4:94CV169-S-O, 1995 WL 1945567 (N.D. Miss., June 23, 1995), an unreported magistrate judge's decision involving Mississippi Gaming Commission files.  In *Arce*, the former Chief Executive Officer of a casino had been terminated and had sued his former employer for breach of contract and defamation.  To defend itself, the casino sought production of the licensure file of the Mississippi Gaming Commission files on Arce. It issued a Rule 45(b) subpoena duces tecum upon the nonparty Mississippi Gaming Commission seeking the production of documents.  In particular, the defendant contended "that [the Commission's] file on Arce, one of the plaintiffs in this action, are relevant and that discovery is necessary to the preparation of its defense against plaintiffs' claims of breach of contract and defamation."  In ruling upon the Commission's motion to quash based on Mississippi state law concerning confidentiality of gaming records, the court emphasized the significance of Nevada law on the issue:

> Often such a ground breaking task is rather difficult, but here the parties suggest in their memoranda, as well as during the *in camera* proceedings, that since the Mississippi Gaming Control Act is patterned after Nevada's act which contains a confidentiality provision identical with that of [Mississippi law], Nevada decisions furnish helpful guidance.  The court agrees. The parties have cited two decisions of the United States District Court for the District of Nevada construing and applying the identical statutory language in a context very similar to the present one. *Laxalt v. McClatchy*, 109 F.R.D. 632 (D. Nev. 1986) (*Laxalt I*); *Laxalt v. McClatchy*, 116 F.R.D. 455 (D. Nev. 1986) (*Laxalt II*).

*Id*. at *2 (emphasis added).  After applying the four-part test endorsed in *Laxalt II*, *Arce* required the production of 19 items from the Commission's file on plaintiff. *Id*. at *4.

In requiring this disclosure, the court crafted appropriate protections for the Commission's interests.  After rejecting the contention that the Commission was immune from disclosing its work product, the court fashioned a procedure designed to balance the various parties' interests:

> [The Commission] suggested, as an alternative, in its motion to quash that the court conduct an *in camera* examination of the file in question and that there should be present during the *in camera* examination the [the Commission] inspector familiar with [the Commission]'s investigation of Arce to assist the court by explaining the content and significance of file documents. It also suggested that counsel for [the Commission] be present, as well as counsel for the parties to this action, but excluding the parties themselves. The court adopted that suggestion, as well as the further suggestion that note taking be prohibited during the *in camera* proceedings and that disclosure of information contained in materials not ordered by the court to

9

be produced for use in this action be prohibited.

*Id*. at *1.

In the current case, the court adopted the four-part test suggested by *Warner Communications* and *Laxalt II* at its September 30 hearing. That test, as summarized by *Laxalt II*, bears repeating:

> In applying this weighing process [in *Warner Communications*], the court found a four part test helpful. Initially, the relevance of the evidence must be taken into account. Further, the availability of other evidence and the government's role in the litigation must be considered. Finally, the court noted that the extent to which disclosure would hinder frank and independent discussion regarding the agencies contemplated decisions and policies would factor into the court's decision.

*Laxalt II*, 116 F.R.D. at 459 (citing *Warner Communications, Inc.*, 742 F.2d at 1161).

Applying that test here, the alleged relevance of the documents to Mr. Smith's defense was potentially high. At the core of the libel charges are statements about Mr. Adelson that relate directly to the 1989 licensure proceeding. Mr. Smith had taken Mr. Adelson's deposition, and Mr. Adelson's responses were less than responsive. Although the Board was not a party to the litigation, it strongly and assertively maintained that absolute confidence in its ability to keep its files confidential was essential to its mission. This goal is underscored by the legislature; it states in NEV. REV. STAT. § 463.0129.1:

> The Legislature hereby finds, and declares to be the public policy of this state, that:
>     (a) The gaming industry is vitally important to the economy of the State and the general welfare of the inhabitants.
>     (b) The continued growth and success of gaming is dependent upon public confidence and trust that licensed gaming and the manufacture, sale and distribution of gaming devices and associated equipment are conducted honestly and competitively, that establishments which hold restricted and nonrestricted licenses where gaming is conducted and where gambling devices are operated do not unduly impact the quality of life enjoyed by residents of the surrounding neighborhoods, that the rights of the creditors of licensees are protected and that gaming is free from criminal and corruptive elements.
>     (c) Public confidence and trust can only be maintained by strict regulation of all persons, locations, practices, associations and activities related to the operation of licensed gaming establishments, the manufacture, sale or distribution of gaming devices and associated equipment and the operation of inter-casino linked systems. . . .

Given this strong interest, the court, at the September 30 hearing, established a process to balance the competing interests of the parties. Drawing on elements of *Laxalt I, Laxalt II, Berst* and *Arce*,

10

the court attempted to craft a disclosure process that would protect the state's and Mr. Adelson's interests while ensuring that Mr. Smith obtained the information to which he is entitled. It is to that process that this opinion now turns.

**Process**

Following the initial hearing on September 30, the court entered an order detailing the procedure to be employed for the production. In drafting that order, the court took into account the various procedures and safeguards suggested by *Berst*, *Arce* and the *Laxalt* decisions.

With respect to the actual production, the Board stated that, given their age, its files were on microfiche. The Board, however, agreed to transfer the images to paper hard copy, and to bring them to the court when a date convenient to all parties was agreed. That date was October 10, 2008.

At that time, the Board produced two documents: the original application of LV Sands, Inc. (of which Mr. Adelson was a principal); and the Board's internal investigative report.[12] The application was 87 pages; the report was 367 pages (excluding the application, which is automatically made part of the report under Board custom and practice). The court received them under seal.

Following the procedure suggested by *Arce*, that seal was then broken in the presence of an attorney from the Board,[13] but no other parties. The Board also provided a document entitled "Privilege Log."[14] This document reiterated the Board's opposition to any production, and then presented its position as to the relevance of each page produced under seal, and its arguments as to

---

[12]The Board takes the position that all but the first page of the application is confidential and is not a document generally available to the public.

[13]Pursuant to the initial order, no one but the court was permitted to take notes at any stage of this process; the parties refer to this colloquially as "attorneys' eyes only."

[14]At the court's suggestion, the Board indicated that it would separately file this document under seal.

11

whether these pages should be produced.

Using this Privilege Log as a guide, and following similar procedures in *Berst* and *Arce*, the court performed an independent examination of each page of the two documents produced. Any page that related to acts or individuals referred to in the allegedly defamatory portions of *Sharks in the Desert* was extracted from the documents and set aside for further examination. For the most part, the court followed the Board's preliminary conclusions, but not always. At the end of this review, 16 pages from the application and 33 pages from the report were set aside.

At this point, in accordance with the September 30 order, one attorney for each side was permitted to enter the room in which the documents were kept. The court then allowed each side, plus the Board, to review each page that had been extracted and to make arguments as to whether the particular page should be produced in light of *Laxalt I*, *Laxalt II*, and *Warner Communications*.[15] Each attorney complied with the September 30 order's requirement that there be no note taking by the attorneys.

After hearing all parties on all pages, the court required the Board to produce four unredacted pages, and three partially redacted pages, all from the application. No pages from the investigative report were required to be produced.

The court and the parties then went into a courtroom and on the record explained the above process. The court allowed attorneys for each side to state any remaining objections. In addition, at the request of the Board, the parties stipulated as to how the documents ultimately produced would be handled and distributed.

---

[15]Mr. Adelson's opposition centered on the application of *Warner Communications* to the subpoena. But it also complained that Mr. Smith did not comply with the procedural requirements of NEV. REV. STAT. § 463.341, and that these procedural requirements rise to the level of substantive privacy protections. As such, Mr. Smith was obliged to follow them. This argument was answered in *Laxalt I*, 109 F.R.D. at 635, in which the court held that an identical inquiry was necessarily a federal one regarding compliance with Rule 45, with the relative interests of the State of Nevada and the parties being balanced according to the procedures set forth in that rule. *See id*. ("Literal compliance [with NEV. REV. STAT. § 463.341] is not required because the Federal Rules of Civil Procedure cover the situation.").

12

By separate order, the court is ordering the Board to produce the pages designated for release. At the request of counsel for Mr. Adelson, the court will delay ordering the production until October 20, to give counsel time to appeal the court's ruling. Until the court's further order, the application and report will be kept under seal.[16]

Copies sent to:

DONALD J CAMPBELL lucinda@campbellandwilliams.com, djc@campbellandwilliams.com; mary@campbellandwilliams.com

RYAN A LOOSVELT rloosvelt@duanemorris.com, dcanderson@duanemorris.com; jldailey@duanemorris.com;tgflangas@duanemorris.com

RICHARD MCKNIGHT mcknightlaw@cox.net, gkopang@lawlasvegas.com; cburke@lawlasvegas.com

DAVID J. POPE dpope@ag.nv.gov, dturman@ag.nv.gov

---

[16]During the in camera proceeding, Mr. Adelson's counsel raised for the first time the issue that the discovery cutoff had occurred after the September 30 hearing and before the in camera inspection. He then requested exclusion of any documents produced as late, especially since he had been denied an order permitting a third-party deposition after the cutoff date.

Mr. Smith's efforts to obtain this discovery and the September 30 ruling all predate the discovery cutoff. To deny Mr. Smith the information because of the delay of the Board in producing the documents would be fundamentally unfair, and thus the court will deem the documents produced to be delivered before the discovery cutoff.

The same cannot be said of the third-party deposition denied to Mr. Adelson. In that situation, the deponent had appeared for one deposition, only to be told that the attorney for Mr. Adelson could not be present, and that the deposition would have to be continued. The deponent left (although he knew of the scheduling conflict), promptly filed an objection with the court, and has refused to cooperate since then. Six weeks later, and four days before the discovery cutoff, counsel for Mr. Adelson moved for an order shortening time for a motion to require the deponent to again appear. The court denied the request for lack of diligence by Mr. Adelson's counsel.

DOMINICA C. ANDERSON
DUANE MORRIS LLP
701 BRIDGER AVENUE, SUITE 670
LAS VEGAS, NV 89101

GEORGE E. HARRIS
3675 W. TECO SUITE 10
LAS VEGAS, NV 89118

MARTIN D. SINGER
2049 CENTURY PARK EAST #2400
LOS ANGELES, CA 90067

# # #